This appeal involves a dispute between a father and son over the ownership of a tract of land.
The plaintiff, Harry S. Haginas, the father, appeals from a judgment of the Circuit Court of Mobile County declaring the defendant, Seraphim H. "Sam" Haginas, the son, to be the sole owner of the property in dispute. We affirm.
The issues presented are: (1) Whether the trial court erred in determining that Harry Haginas obtained by means of undue influence the "correction deed" under which he claims title and (2) whether the principle of equitable estoppel was appropriate here to estop Harry Haginas from asserting alleged defects in the original deed to Sam Haginas.
Harry Haginas and Sam Haginas each claims title to the property in question by virtue of separate deeds from the deceased grantor, Elizabeth Haginas, who was the mother of Harry and the grandmother of Sam.
The deed to Sam Haginas (the "original deed") was executed on October 4, 1985. The deed to Harry Haginas (the "correction deed") was executed on August 22, 1988. Elizabeth Haginas was a nursing home resident when she executed the deeds.[1]
According to the evidence, the grantor executed the 1985 original deed to Sam before two witnesses; however, neither witness signed the deed as an attesting witness. The evidence also showed that the secretary who notarized the deed did not see the grantor sign the deed.
The correction deed purported to correct the original deed by changing the grantee's name on the deed from Sam Haginas to Harry Haginas. Also, the correction deed stated that the grantor, Elizabeth, anticipated a conveyance from Sam Haginas, grantee in the original deed, for the purpose of correcting the alleged error.
After the grantor died, Harry Haginas recorded the correction deed and filed a quiet title action. Sam Haginas then counter-claimed to quiet title in him. The trial court quieted title in Sam Haginas, and Harry appealed.
The first issue presented is whether the trial court erred in finding that the correction deed to Harry Haginas was obtained by undue influence.
The trial court heard ore tenus evidence.
 "[The] standard of review where the trial court has heard ore tenus testimony is that we will presume that the trial court's judgment is correct and that it will be reversed only if the judgment is found to be plainly and palpably wrong after a consideration of all of the evidence and after making all inferences that can logically be made from the evidence."
King v. Travelers Insurance Co., 513 So.2d 1023, 1026 (Ala. 1987).
Here, the relationship between the grantor and the grantee of the correction deed was that of parent and child. Under our law, "[t]he relationship of parent and child is per se a confidential one," and "[t]he law presumes that the parent is the dominant spirit, but this presumption is not conclusive."Chandler v. Chandler, 514 So.2d 1307, 1308 (Ala. 1987). " 'Where it is made to appear by the proof that the child, and not the parent, is the dominant spirit, then the burden of proof is shifted to the former to establish the fairness of the transaction, and that it was not the result of undue influence.' " Chandler at 1308, quoting Dowe v. Farley,206 Ala. 421, 422, 90 So. 291, 292 (1921); Tipton v. Tipton,249 Ala. 537, 539, 32 So.2d 32, 34 (1947). See also, Jones v.Boothe, 270 Ala. 420, *Page 1336 119 So.2d 203 (1960); Orton v. Gay, 285 Ala. 270, 231 So.2d 305 (1970);Wolfe v. Thompson, 285 Ala. 745, 235 So.2d 878 (1970). "[T]he burden is upon those seeking to invalidate such a transaction to reasonably satisfy the court that time and circumstances have reversed the order of nature, so that the dominion of the parent has not merely ceased, but has been displaced by subservience to the child." Chandler at 1308, quoting Dillardv. Hovater, 254 Ala. 616, 619, 49 So.2d 151, 153 (1950) (emphasis added; citations omitted). See also Seals v. Seals,423 So.2d 222 (Ala. 1982); Croft v. Biddle, 380 So.2d 816 (Ala. 1980); Powell v. Powell, 285 Ala. 230, 231 So.2d 103 (1970); and Milliner v. Grant, 253 Ala. 475, 45 So.2d 314 (1950).
Chandler v. Chandler states the standard of proof where a confidential relationship exists:
 "The party seeking to have the deed set aside need only show to the reasonable satisfaction of the court that the grantee was the dominant party in a confidential relationship with the grantor, whereupon the burden shifts to the grantee to show that the transaction was 'fair, just, and equitable in every respect.' "
514 So.2d at 1308, quoting Brothers v. Moore, 349 So.2d 1107,1109 (Ala. 1977).
Harry offered an affidavit, written by him and signed by Elizabeth Haginas, which stated that the property in question had belonged to Harry but that Harry had conveyed the property to Elizabeth after her husband's death so that she would have a feeling of security and a home of her own. The affidavit stated that Elizabeth wanted Sam Haginas to transfer title back to Harry.
David Scott Wright, an attorney, testified that he had prepared a lawsuit to correct the deed situation but that the complaint was never filed. Mary Ann Johnston, an employee of Cogburn Health Center, identified handwritten notes that she had written for Elizabeth indicating that Elizabeth wanted to leave the property to Harry. Nevertheless, there was evidence to the contrary.
Harry's sister, Norma Kavalos, testified that after 1985 she had received a letter from Elizabeth in which Elizabeth indicated that she was extremely upset because Harry was trying to get her to do something she did not want to do. Elizabeth stated in the letter that she had signed the correction deed to please Harry. She wrote that she was being pressured and that she did not want to do what Harry wanted her to do.
Tina Diehl, Harry's daughter and Sam's sister, testified that her grandmother Elizabeth had become very upset and had executed the correction deed to Harry because Harry would not come and visit her unless she signed it. Steve Clikas, one of Elizabeth's grandsons, testified that during the last year and a half of Elizabeth's life she was confused and was always angry with Harry. Mary Ann Johnston, of Cogburn Nursing Home, where Elizabeth resided when she signed the deed to Harry, testified that Elizabeth would usually be very upset after Harry's visits. Mrs. Johnston testified that on one occasion Harry and an attorney brought a document for Elizabeth to sign and that she refused to sign it. She stated that Elizabeth was crying at that meeting, saying that she did not want to sign and that she did not know what she was signing. This happened in August 1988. The correction deed was executed on August 22, 1988.
The evidence of the circumstances surrounding Harry and Elizabeth's relationship at the time the correction deed was executed was sufficient to permit the trial judge to conclude, as he did, that, by the time the correction deed was executed, time and circumstance had, in fact, reversed Harry's and Elizabeth's roles and that Elizabeth had become subservient to Harry. In view of this evidence, the trial court did not err in shifting the burden to Harry to show that the transaction was "fair, just, and equitable in every respect." See Brothers v.Moore, 349 So.2d 1107 (Ala. 1977).
We have reviewed the record, and we conclude that the trial court did not err in holding that Harry Haginas failed to carry *Page 1337 
his burden. We thus affirm the judgment of the trial court holding that the correction deed was the product of undue influence exercised on the grantor.
The other issue involved on this appeal is whether the trial court should have applied the doctrine of equitable estoppel to prevent Harry Haginas from asserting that the defects in the original deed to Sam Haginas invalidated that deed. Harry Haginas claims, and Sam Haginas does not dispute, that the 1985 deed to Sam Haginas did not comply with the requirements of § 35-4-20, Code of Alabama 1975. The fact that the deed was not properly attested or acknowledged is uncontroverted. What is in dispute is whether Harry's involvement in the execution of the faulty deed warrants application of the equitable principles of estoppel to prevent him from now changing his position with regard to the deed. "The purpose of equitable estoppel and promissory estoppel is to promote equity and justice in an individual case by preventing a party from asserting rights under a general technical rule of law when his own conduct renders the assertion of such rights contrary to equity and good conscience." First National Bank of Opp v. Boles,231 Ala. 473, 479, 165 So. 586, 592 (1936).
In Mazer v. Jackson Ins. Agency, this Court said:
 "Equitable estoppel is ' ". . . based upon the ground of public policy and good faith, and is interposed to prevent injustice and to guard against fraud by denying to a person the right to repudiate his acts, admissions, or representations, when they have been relied on by persons to whom they were directed and whose conduct they were intended to and did influence.
The doctrine of estoppel is far reaching in its effect, extending to real as well as personal estate, and embracing almost every enterprise in which men may be engaged." ' "
340 So.2d 770, 772 (quoting First National Bank of Opp, supra, quoting in turn 21 C.J. § 120 pp. 1117-18). The Mazer Court went on to state the elements of equitable estoppel as found in Dobbs, Remedies § 2.3 (1973):
 " 'An estoppel . . . has three important elements. The actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence. The other relies upon that communication. And the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct.' "
340 So.2d at 773.
The witnesses to the original deed, Tina Diehl and Nora Kavalos, testified that Harry Haginas, upon discovering that the deed had not been acknowledged, instructed them to have a secretary notarize the grantor's signature even though she did not witness the grantor's signing of the deed. Meanwhile, Sam Haginas did not participate in the execution of this original deed, nor did he have knowledge of these events that were taking place in regard to it. Because Sam was unaware of the faulty acknowledgment, he was unable to take steps to cure the defects. However, Harry Haginas was aware of the faulty acknowledgment and said nothing about it. Sam took possession of the property that was deeded to him and has paid the taxes on it from 1985 until the present. He has maintained the property from the time of the original deed, including the time after the correction deed was executed; the correction deed was executed approximately one year before the grantor's death. Harry never attempted to gain possession of the property, nor did he say anything to Sam regarding his claimed ownership of the property until after the grantor's death.
The evidence supports the following factual conclusions: (1) Harry Haginas had knowledge of the improper attestation and notarization of the 1985 deed; (2) He directed the witnesses to have the deed improperly notarized; (3) Harry Haginas never told Sam Haginas about the defects in his deed so that Sam could take steps to cure them before the grantor died; (4) Sam Haginas relied on Harry's misrepresentation to his *Page 1338 
detriment; and (5) Any claim against the deed by Harry would be inconsistent with his earlier conduct and Sam would suffer material harm thereby.
"[T]he issue of estoppel is generally considered to be for the fact finder unless only one reasonable inference can be drawn from the evidence." Taylor v. Waters, 477 So.2d 441, 443
(Ala.Civ.App. 1985). We are convinced that the trial court had sufficient evidence to find: (1) That the correction deed to Harry Haginas was a product of undue influence, and (2) that application of the doctrine of equitable estoppel is appropriate in this case to prevent injustice to Sam Haginas.
For the foregoing reasons, we affirm the judgment of the trial court.
AFFIRMED.
HORNSBY, C.J., and SHORES, HOUSTON and KENNEDY, JJ., concur.
[1] She was confined to Hillhaven Nursing Home when she executed the deed to Sam Haginas in 1985 and to the Cogburn Health Center when she executed the correction deed to Harry Haginas in 1988.